UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-61080-civ-MORENO

JALINE FENWICK, individually &
on behalf of all others similarly situated,

  Plaintiff,

v.

FLORIDA PET RETAILERS, INC. &
POOCHES OF PINES, INC. d/b/a
PETLAND PEMBROKE PINES,

  Defendants.

_____/

## DEFENDANTS' MOTION TO STAY PENDING
## FCC'S PROMULGATION OF REVISED DEFINITIONS

Pursuant to Local Rule 7.1, Defendants Florida Pet Retailers, Inc. and Pooches of Pines, Inc. hereby move this Court for an order staying this action pending rulings from the Federal Communications Commission ("FCC" or "Commission") regarding the definition of an automatic telephone dialing system under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA").

### *Summary of Argument*

The Defendants operate a small franchise selling pets and pet supplies in Florida. The Complaint, one of many filed under the TCPA, seeks at least $500 and no more than $1,500 for each text message sent to a class of over 4,000 putative plaintiffs. Despite the Plaintiff and class-members suffering no actual damages – merely statutory damages – the Defendants are facing between $2,000,000 and $6,000,000 or more in damages. To say the potential damage award is catastrophic, not to mention grossly disproportionate to an actual wrongdoing, is an understatement.

Like almost all TCPA cases, this case turns on the definition of an "automatic telephone dialing system." The TCPA pre-dates text messaging, and as a result, these lawsuits rely not on the plain text of the Act, but rather on the FCC's implementing regulations and interpretation of the Act. The FCC's interpretation of the Act, specifically as it relates to an "automatic telephone dialing system," is currently unknown and under review because the D.C. Circuit Court of Appeals issued an opinion that vacated several FCC orders. *See ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018). On May 14, 2018, the FCC requested public comment as part of its rulemaking process in light of *ACA International*. "What constitutes an 'automatic telephone dialing system'" is the very question posed by the FCC, and the very question at issue in this litigation. It is likely that the TCPA will be interpreted differently by the Commission before the 2020 trial date, and given the feeding frenzy of TCPA class actions and current makeup of the Commission, it is likely the FCC will narrowly construe the definition to better serve the actual purpose of the Act.

Numerous courts, including this Court, have stayed TCPA class actions while awaiting the FCC's promulgation of the revised definition of an automatic telephone dialing system. *See, e.g., Secure v. Ultimate Fitness Group, LLC*, 2019 WL 1612623 (S.D. Fla. Mar. 18, 2019) (Moreno, J.). Defendants here seek the same relief that was given in those cases and for the same fundamental reason.

### *Introduction*

"[W]hat constitutes an 'automatic telephone dialing system?" The FCC posed this question in its May 14, 2018 Request for Public Comment, which followed closely on the heels of the D.C. Circuit's decision in *ACA International v. Fed. Communications Commission*, 885 F.3d 687 (D.C. Cir. 2018). FCC Public Notice, "Consumer and

Governmental Affairs Bureau Seeks Comment on Interpretation of the Telephone Consumer Protection Act in Light of the D.C. Circuit's ACA International Decision," CG Docket Nos. 18-152, 02-278 ("FCC's Request for Comment" The definition of an autodialer has been left in doubt since *ACA International.* There, the D.C. Circuit vacated the FCC's prior rulings regarding the definition of an autodialer but declined to promulgate a new standard.  Other courts have split over the scope and impact of *ACA International* and the FCC's prior orders.  Because of *ACA International* and varying court rulings, the FCC intends to clarify the definition of an autodialer.

The FCC has the required expertise and authority to determine the scope and nature of an autodialer under the TCPA.  The Act expressly authorizes the FCC to promulgate implementing regulations to enforce the Act. The pending FCC rule(s) will have a potentially dispositive impact on this case.  Accordingly, a stay is warranted under the primary jurisdiction doctrine until such time that the FCC issues a ruling.

Indeed, in July of 2018, Judge Rosenberg issued a stay in a putative TCPA class action until the FCC issues its ruling on the ATDS definition.  *See Buhr v. ADT LLC*, No. 18-cv-80605, Dkt. No. 40 (S.D. Fla. July 25, 2018). Additionally, in *Scoma Chiropractic, P.A. v. Dental Equities, LLC*, 2018 WL 2455301 (M.D. Fla. June 1, 2018), Judge Steele in a similar TCPA case dealing with facsimile technology granted a stay pending a decision by the FCC under the primary jurisdiction doctrine.  This Court already granted a similar motion to stay in *Secure v. Ultimate Fitness Group, LLC*, 2019 WL 1612623 (S.D. Fla. Mar. 18, 2019) (Moreno, J.).

As explained below, the rationale for issuing a stay in *Buhr*, *Scoma* and *Secure* applies with equal, if not greater, force to this case for the following reasons:

3

First, the FCC is currently considering the precise questions at issue here: "[w]hat constitutes an automatic telephone dialing system [under the TCPA]?" "How 'automatic' must dialing be for equipment to qualify as an automatic telephone dialing system? Must such a system dial numbers without human intervention?" "If equipment cannot itself dial random or sequential numbers, can that equipment be an automatic telephone dialing system?"

Second, courts have already reached inconsistent determinations regarding the definition of an autodialer in the wake of the D.C. Circuit's ruling. Some courts have held that the D.C. Circuit's ruling vacated all the FCC's prior orders regarding the definition of an autodialer, leaving only the statutory definition - *i.e.*, only systems that can themselves dial randomly or sequentially produced telephone numbers. *See, e.g.*, *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 935 (N.D. Ill. 2018) *("ACA International* necessarily invalidated the 2003 and 2008 Declaratory Ruling insofar as they provide, as did the 2015 Declaratory Ruling, that a predictive dialer qualifies as an ATDS even if it does not have the capacity to generate phone numbers randomly or sequentially and then dial them."). The Ninth Circuit recently held in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1049 (9th Cir. 2018) that all prior FCC orders were invalidated, leaving the court with only the plain language of the Act itself. But, several paragraphs later it acknowledged that "the statutory language is ambiguous" and it proceeded to consider legislative intent and history. *Id.* at 1051. The Act expressly authorizes the FCC to do what the Ninth Circuit attempted to do.  If this case proceeds to judgment without the FCC's guidance, "there is a risk that the Court could reach a determination that is inconsistent with the FCC's ultimate decision" on the definition of an autodialer. *Scoma*, 2018 WL 2455301

4

at *3. Not staying the case puts this Court in the same unnecessary conundrum that the Ninth Circuit found itself in.

Third, considerations of prejudice and the potential costs of not awaiting agency review counsel in favor of a stay. Plaintiff seeks to certify a class that the Defendants estimate to include over 4,000 individuals who received text messages and to penalize the Defendants at least $500.00 for each of the text messages sent during this period, creating the possibility for an astronomical aggregated statutory damages award. If the FCC issues a ruling that narrows the definition of an autodialer, this case ends. Under these circumstances, courts routinely find that any prejudice to the non-moving party is outweighed by the potential harm to the moving party and the interests of avoiding inconsistent decisions.

Furthermore, Plaintiff will suffer no prejudice. Plaintiff is not seeking actual damages, merely statutory damages. She is not being "compensated" for any loss. There is no allegation or evidence that the Defendants are continuing to send text messages (and in fact they are not). The potential substantial harm to the Defendants – which may very well be invalidated as a matter of law from the outset – outweighs the *de minimis* harm to Plaintiff in waiting a few months to possibly recover statutory damages.

Fourth, not granting a stay will almost certainly *increase* the litigation costs and require substantially more court intervention because one or more parties will likely file various motions for reconsideration in light of a change in the law once the FCC acts.

Ultimately, just as in *Scoma*, "a stay will simplify and streamline the issues raised in this case and reduce the burden of litigation on the parties and on the Court. Any delay plaintiff will experience in this case is outweighed by the potential prejudice that could inure

to [the Defendants] and its liability to class members that might very well not fit within the [definition of an autodialer] following the FCC's decision." *Scoma*, 2018 WL 2455301 at *4. A stay is therefore appropriate to give the FCC time to provide guidance on issues that are central to this case and which fall squarely within the FCC's primary jurisdiction.

### *Plaintiff's Claim Turns on Whether an Autodialer Was Used*

In her single-count Complaint, Plaintiff alleges that she received text messages from the Defendant via an autodialer. She has no specific allegations concerning the Defendants' "autodialer," but rather relies upon circumstantial evidence and information and belief to state her claim. To maintain her claim, Plaintiff must establish that the device used to send the text messages constitutes an ATDS. Under the Act, it is unlawful for a person "to make any call (other than a call made [] with the prior express consent of the called party) using any automatic telephone dialing system or prerecorded voice ... (iii) to any telephone number assigned to a ... cellular telephone service[.]" 47 U.S.C. § 227(b)(l)(A). The elements of the cause of action are: (1) the defendant made a call to a cell phone, (2) by the use of an automatic dialing system or an artificial or recorded voice, and (3) without prior express consent of the called party. *See Cummings v. Rushmore Loan Management Service*, 2017 WL 4005455, *2 (M.D. Fla. Sep. 12, 2017).

### *The Ever Changing Definition of an Autodialer*

The TCPA was enacted in 1991 – a year before the first experimental text message was ever sent. *See Its Been 25 Years Since the First Ever Text Message and the Kids are Alright*, https://www.abc.net.au/news/science/2017-12-03/after-25-years-of-sms-were-still-anxious-about-text-speak/9205734 (last viewed Jun. 21, 2019). It defines an ATDS as "equipment which has the capacity . . . to store or produce telephone numbers to be called,

using a random or sequential number generator[,] and . . . to dial such numbers." 47 U.S.C. §227(a)(l). The Act expressly authorizes the FCC to promulgate implementing regulations. *ACA Int 'l,* 885 F. 3d at 693.

Following the TCPA's enactment, the FCC affirmed that an ATDS must generate numbers in a random or sequential fashion. In 1992, the FCC issued an order stating that the TCPA's prohibitions against using an ATDS "clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 7 F.C.C. Red. 8752, 1776 (1992). And, in a follow-on 1995 ruling, the FCC described "calls dialed to numbers generated randomly or in sequence" as "autodialed." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 F.C.C. Rcd. 12391, 12400 (1995).

In 2003, the FCC issued an order finding, among other things, "that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 14093 (2003) ("2003 Order"). The 2003 FCC order defined a predictive dialer as "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call." *Id.* at 14143 n.31. The FCC determined that predictive dialers fall within the definition of an ATDS, even though they may not "store or produce telephone numbers to be called, using a random or sequential number generator," as

set forth in the text of the TCPA. *Id.* at 14091. The FCC concluded that the defining characteristic of an ATDS   is "the capacity to dial numbers without human intervention." *Id.* at 14092. Though a predictive dialer might not fit squarely within the TCPA's statutory definition of an ATDS, the FCC found that it is the sort of *automated* equipment Congress intended to address through the TCPA because it has the "capacity to dial numbers without human intervention." *Id.* at 14092-93.

In 2008, the FCC issued a declaratory judgment that  "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." *In the Matter of Rules & Regulations  Implementing the Tel. Consumer Prat. Act of 1991*, 23 FCC Red. 559, 566 (2008). In 2012, the FCC again reiterated that the TCPA's definition of an ATDS "covers any  equipment that has the specified capacity to generate numbers and dial them *without human intervention*  regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prat. Act of 1991*, 27 FCC Red. 15391, 15392 n.5 (2012) (emphasis added).

Finally, in its 2015 Order,  the FCC took a controversial and expansive view of the definition of an autodialer, stating that the "capacity" to dial numbers randomly or sequentially "includes ... potential functionalities," not just its "present ability." *See in the Matter of Rules & Regulations Implementing the Tel. Consumer Prat. Act of 1991*, 30 FCC Red. 7961, 7974-76 (2015) ("2015 Order"). Despite promulgating this broader definition, the FCC reaffirmed that "the basic functions of an autodialer is to dial numbers *without human intervention." Id.* 7975 (internal quotations omitted) (emphasis added).

*ACA International* **and the FCC's Request for Public Comment**

On March 16, 2018, the D.C. Circuit struck down portions of the 2015 Order, and (as confirmed recently by the Ninth Circuit in *Marks*) vacated the FCC's 2003 and 2008 rulings regarding the definition of an autodialer, holding that the FCC's Order "falls short of reasoned decision-making in 'offer[ing] no meaningful guidance' to affected parties" because it chose differing, contrary interpretations or no interpretations at all as to ATDS functionality. *ACA,* 885 F.3d at 701. Specifically, the D.C. Circuit held that "the Commission adopted an expansive interpretation of 'capacity' having the apparent effect of embracing any and all smartphones." *Id.* at 695-96.  This expansive definition swept too far: "The more straightforward understanding of the Commission's ruling is that all smartphones qualify as autodialers because they have the inherent 'capacity' to gain ATDS functionality by downloading an app. That interpretation of the statute, for all the reasons explained, is an unreasonably, and impermissibly, expansive one." *Id.* at 700.

The D.C. Circuit also invalidated the 2003 and 2008 Orders' expanding the  ATDS definition to include predictive dialers.  Specifically, regarding "whether a device must itself have the ability to generate random or sequential telephone numbers to be dialed" or can simply "call from a database of telephone numbers generated elsewhere," the D.C. Circuit said the FCC was "of two minds on the issue." *Id.* at 701. Rather than allow for the latter possibility, the D.C. Circuit stated that the FCC "fail[ed] to satisfy the requirement of reasoned decision-making interpretation" and held that "[w]e must therefore set aside the Commission's treatment of those matters." *Id.* at 703.

Concerning human intervention, the D.C. Circuit noted that although the FCC

had consistently stated "that the 'basic function' of an autodialer is the ability to 'dial numbers without human intervention,'" it "nevertheless declined a request to 'clarify[ ] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention.'" *Id.* at 703 (quoting 30 FCC Red. at 7973, 7975-76). The D.C. Circuit concluded that "[t]hose side-by-side propositions are difficult to square" – *i.e.*, a device can be an autodialer even if it dials numbers *with* human intervention notwithstanding that the "basic function of an autodialer is to dial numbers without human intervention." *Id.* at 703.

Given the D.C. Circuit's decision, the FCC must now decide anew if anything beyond a system that randomly or sequentially generates numbers on its own and then dials them can constitute  an ATDS. If the FCC answers  that question in the affirmative, it must clarify, inter *alia*, what human intervention is required.

Just two months after the D.C. Circuit's ruling, the FCC issued its Request for Comment regarding the interpretation and implementation of the TCPA.  In its Request, the FCC posed the following pertinent  questions:

> We seek further comment on the functions a device must be able to perform to qualify as an automatic telephone dialing system. Again, the TCPA defines an *"automatic* telephone dialing system" as "equipment which has the  capacity- (A) to store or produce telephone numbers to be called, *using a random or sequential number generator;* and (B) to dial *such numbers."* Regarding the term "automatic," the Commission explained that the "basic function[]" of an automatic telephone dialing system is to "dial numbers without human intervention" and yet "declined to 'clarify[] that a dialer is not an [automatic telephone dialing system] unless it has the capacity to dial numbers without human intervention.'" As the  court put it, "[t]hose side-by-side propositions are difficult to square." The court further noted the Commission said another basic function was to "dial thousands of numbers in a short period of time," which left parties "in a significant fog of uncertainty" on how to apply that notation. How "automatic" must dialing be for equipment to qualify as an automatic telephone dialing system? Does the word "automatic" "envision non-manual dialing of telephone numbers?" Must

such a system dial numbers without human intervention? Must it dial thousands of numbers in a short period of time? If so, what constitutes a short period of time for these purposes?

Request for Comment at 2-3 (internal citations omitted) (emphasis in original).

On October 3, 2018, the FCC issued a public notice seeking further comment on the ATDS definition in light of the Ninth Circuit's decision in *Marks*. *See* Consumer and Governmental Affairs Bureau Seeks Further Comment on Interpretation of the Telephone Consumer Protection Act considering the Ninth Circuit's *Marks v. Church San Diego, LLC* Decision, Docket No. 02-278 (Oct. 3, 2018). The comment period for both long ended.

The questions posed by the FCC, and how the FCC ultimately answers them, will likely be dispositive of the merit's questions before the Court in this case.

### *Post-ACA International* Decisions Have Inconsistently Interpreted the Definition of An Autodialer

In just the few months following the D.C. Circuit's ruling in ACA *International*, courts have split over the import of the decision, the status and continuing viability of the FCC's prior Orders, and the definition of an autodialer.

The Second, Third, and Ninth Circuits have issued opinions on the ATDS definition since *ACA International* and have taken diverging views. Both the Second and Third Circuits agreed with the D.C. Circuit's holding that the ATDS definition cannot include a system's potential capacities. *See King,* 2018 WL 3188716, at *3 ("Although we are not bound by the D.C. Circuit's interpretation of the statute, we are persuaded by its demonstration that interpreting 'capacity' to include a device's 'potential functionalities' after some modifications extends the statute too far."); *Dominguez v. Yahoo*, Inc*.,* No. 17-1243, 2018 WL 3118056, at *2 (3d Cir. June 26, 2018) ("In light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did

prior to the issuance of 2015 Declaratory Ruling. Dominguez can no longer rely on his argument that the Email SMS Service had the latent or potential capacity to function as autodialer."). Additionally, the Third Circuit expressly stated that random or sequential number generation is required to fit within the statutory ATDS definition, and the Second Circuit appeared to accept that approach. *See Dominguez,* 2018 WL 3118056, at *2 (stating "key factual question" is "whether the Email SMS System functioned as an autodialer by randomly or sequentially generating telephone numbers and dialing those numbers"); *see generally King,* 2018 WL 3188716. Despite these holdings, neither court reached the questions of whether the FCC's prior orders regarding predictive dialers, remain good law or how the human intervention standard has been affected. *See generally King,* 2018 WL 3188716; *Dominguez,* 2018 WL 3118056. Indeed, the Second Circuit in *King expressly* highlighted the open questions that remain in the wake of *ACA International* decision. In response to "Time Warner['s] argu[ment] that the district court improperly relied on a 'human involvement' standard that is not reflected in the statute," the court noted that the FCC declined to adopt a standard in its 2015 Order and stated "we venture no opinion on whether that lack of human involvement is a consideration relevant to King's claims." *King*, 2018 WL 3188716, at *7.

The Ninth Circuit in *Marks* took a different approach. It held that *ACA International* vacated all prior FCC orders regarding the ATDS definition and, based on the statutory text alone – which it found "not susceptible to a straightforward interpretation" – found that "equipment that ma[kes] automatic calls from lists of recipients [is] also covered by the TCPA." *Marks*, 904 F.3d at 1051. The Ninth Circuit thus departed from the Third Circuit's holding that random or sequential number

generation is required for a device to be considered an ATDS and, in fact, read the words random or sequential number generator out of the statute. The Ninth Circuit, differing from the Second Circuit in *King,* also offered its opinion on the human intervention issue, stating that "[w]e also reject [the defendant's] argument that a device cannot qualify as an ATDS unless it is fully automatic, meaning that it must operate without any human intervention whatsoever" and that the at-issue system "dials numbers automatically, and therefore it has the automatic dialing function necessary to qualify as an ATDS." *Id.* at 1053.

District courts are also split on the impact of *ACA International. See Pinkus,* 319 F. Supp. 3d at 935 *"ACA International* necessarily invalidated the 2003 and 2008 Declaratory Ruling insofar as they provide, as did the 2015 Declaratory Ruling, that a predictive dialer qualifies as an ATDS even if it does not have the capacity to generate phone numbers randomly or sequentially and then dial them."); *Gonzalez v. Ocwen Loan Servicing, LLC,* No. 5:18-CV-340-OC-30PRL, 2018 WL 4217065, at *5-6 (M.D. Fla. Sept. 5, 2018) (holding *ACA International* overturned the 2003 and 2008 FCC orders); *compare with Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV, 2018 WL 2220417, at *1 (S.D. Fla. May 14, 2018) (concluding that the FCC's 2003 and 2008 predictive dialer rulings were *not vacated* by *ACA International* and remain binding law, even if the 2015 Order was set aside as inconsistent with those earlier rulings)

Courts are also split on the issue of human intervention. At least one court within the Eleventh Circuit correctly found human intervention disqualifies equipment as an autodialer. *See Glasser v. Hilton Grand Vacations Co., LLC,* No. 8:16-CV-952-JDW-AAS, 2018 WL 4565751, at *4 (M.D. Fla. Sept. 24, 2018) (granting defendant's motion

for summary judgment in TCPA case on the ground that equipment in question required human intervention to trigger initiation of calls and noting that the D.C. Circuit's holding in *ACA International* "set aside" the FCC's 2015 Order but "left intact earlier FCC rulings that 'the 'basic function' of an autodialer is to dial numbers without human intervention.'").

### The Court Has the Inherent Power to Issue a Stay

"[T]he powers to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.,* 299 U.S. 248, 254 (1936). In determining whether to grant a stay, courts generally examine whether a stay will unduly prejudice or tactically disadvantage the non-moving party; whether a stay will simplify the issues and streamline the trial; and whether a stay will reduce the burden of litigation on the parties and on the court. *See Coatney v. Synchrony Bank,* No. 616CV389ORL22TBS, 2016 WL 4506315, at *1 (M.D. Fla. Aug. 2, 2016). The specific factors relevant to whether a stay should issue under the primary jurisdiction doctrine are set forth below.

### A Stay is Warranted Under the Primary Jurisdiction Doctrine

Under the primary jurisdiction doctrine, "a court ... may stay an action pending resolution of an issue that falls within the special competence of an administrative agency." *Beach TV Cable Co. v. Comcast of Florida/Georgia, LLC,* 808 F.3d 1284, 1288 (11th Cir. 2015). It applies "to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Boyes v. Shell Oil Prods.* Co., 199 F.3d 1260, 1265 (11th Cir. 2000). The Eleventh Circuit explained the primary jurisdiction doctrine as follows:

14

Primary jurisdiction is a judicially created doctrine whereby a court of competent jurisdiction may dismiss or stay an action pending a resolution of some portion of the actions by an administrative agency. Even though the court is authorized to adjudicate the claim before it, the primary jurisdiction doctrine comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*Smith v. GTE Corp.*, 236 F.3d 1292, 1298 n.3 (11th Cir. 2001) (internal citations omitted).

There are two main justifications for the rule: (1) the expertise of the agency deferred to; and (2) the need for uniform interpretation of a statute or regulation. *Boyes*, 199 F.3d at 1265. Courts invoke the primary jurisdiction doctrine "to advance regulatory uniformity," "to answer a question ... within the agency's discretion," and "to benefit from technical or policy considerations within the agency's ... expertise." *Charvat v. EchoStar Satellite, LLC,* 630 F.3d 459, 466 (6th Cir. 2010) (internal quotations omitted).

Four factors are "uniformly present in cases where the doctrine properly is invoked: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *Bondhus v. Henry Schein, Inc.*, No. 14-22982-CIV, 2015 WL 1968841, at *2 (S.D. Fla. Apr. 30, 2015) (internal quotations omitted). Applied to the facts here, a stay is warranted.

### The FCC Will Decide a Dispositive Issue in the Present Case

First, the FCC's decision will have a significant impact on the case. *See, e.g.*, *Comprehensive Health Care Sys. of Palm Beaches, Inc. v. M3 USA Corp.*, No. 16-CV-80967, 2017 WL 4868185, at *2 (S.D. Fla. Oct. 6, 2017) ("CHCS"). This factor is satisfied

15

if the agency decision could alter the scope of a class, impact motions before the court, or affect a dispositive issue. *Id.* Under the Hobbs Act, this Court is bound by the FCC's orders absence a timely challenge to the order. *See Mais v. Gulf Coast Collection Bureau, Inc.,* 768 F.3d 1110, 1119 (11th Cir. 2014).

As discussed above, the FCC's Request for Comment makes plain that it intends to rule on issues related the ATDS definition that are at issue in the present case. Defendants contend no ATDS was used to send the text messages. Plaintiff, however, will surely contest this position. Although the weight of relevant case law supports a narrow ATDS definition considering *ACA International,* the FCC's forthcoming guidance will speak squarely to issues that are key to resolving this dispute. For example, in its Request for Comment, the FCC asked, "How 'automatic' must dialing be for equipment to qualify as an automatic telephone dialing system? Does the word 'automatic' envision non-manual dialing of telephone numbers? Must such a system dial numbers without human intervention?" Request for Comment at 2. Regarding the requirement that an ATDS must "produce telephone numbers to be called, suing a random or sequential number generator," the FCC asked: "If equipment cannot itself dial random or sequential numbers, can that equipment be an automatic telephone dialing system?" *Id.* at 2-3. These fundamental questions regarding what constitutes an autodialer will, without a doubt, be contested issues in this litigation.

### The FCC's Request for Comment Falls Squarely Within the FCC's Jurisdiction to Administer and Interpret the TCPA

Second, Congress explicitly tasked the FCC with "prescribe[ing] regulations to implement the requirements of the TCPA. *Bondhus*, 2015 WL 1968841, at *3 (quoting 47 U.S.C. § 227(b)(2) and finding this factor satisfied in granting partial stay under primary

jurisdiction doctrine). The FCC's authority also "includes issuing rules clarifying and interpreting the TCPA, as well as addressing petitions." *CHCS,* 2017 WL 4868185, at *6.

### The TCPA Authorized a Comprehensive Regulatory Scheme

Third, the FCC has regulatory authority that subjects the "industry to a comprehensive regulatory scheme that requires expertise or uniformity in administration." *Gusman v. Comcast Corp.*, No. 13CV1049-GPC DHB, 2014 WL 2115472, at *3 (S.D. Cal. May 21, 2014); *see also CHCS,* 2017 WL 4868185, at *2; *Bondhus*, *3.

### The Definition of Autodialer Requires the FCC's Expertise and Uniformity in Administration

Fourth, this Court will benefit from technical or policy considerations within the FCC's expertise. *See, e.g.*, *CHCS,* 2017 WL 4868185, at *7 ("The FCC is charged with expertise in telecommunications regulation…"); *see also Stewart v. T-Mobile USA, Inc.,* No. 4:14-CV-02086-PMD, 2014 WL 12614418, at *3 (D.S.C. Oct. 8, 2014) ("It is virtually without dispute that the FCC has comparative expertise about the TCPA."). Invoking that expertise is particularly appropriate here, where there is substantial confusion and disagreement over the technical elements of an autodialer under the TCPA.

As to the uniformity of administration, if this case proceeds, there is a risk that the Court could reach a determination that is inconsistent with the FCC's ultimate decision on the definition of an autodialer thus necessitating motions for reconsideration or appellate review. Giving time for the FCC to decide how the system at issue in this case is to be treated under the statute will "ensure even application of the TCPA." *Bondhus*, 2015 WL 1968841, at *9.

Each of the four primary jurisdiction factors are easily satisfied in the present case, counseling strongly in favor of a stay.

### Scoma Rejected Objections to a Stay

In *Scoma,* Judge Steele stayed a junk fax case under the TCPA pending the FCC's action on a rulemaking petition asking "the FCC to examine the state of facsimile technology today and issue a declaratory ruling that the TCPA does not apply to faxes sent or received digitally via an online facsimile service, or on a device other than a telephone facsimile machine." 2018 WL 2455301, at *3. After analyzing and applying the primary jurisdiction doctrine, the court granted a stay, and in doing so, rejected the arguments that Plaintiff will likely raise against a stay in this case.

First, the court rejected the argument that a stay would be futile because any action taken by the FCC would not have retroactive effect. *Id.* at *4. The court held that the argument was "premature and does not affect this Court's analysis as to whether a stay is appropriate now. Whether the FCC's decision has retroactive or prospective effect depends on whether the FCC's decision is rulemaking or a clarification (or both), with a lens towards manifest injustice." *Id.* (citing *Qwest Services Corp. v. FCC*, 509 F.3d 531, 535-39 (D.C. 2007)

Second, the court found that "[a]ny delay plaintiffs will experience in this case is outweighed by the potential prejudice that could inure to MasterCard and its liability to class members that might very well not fit within the proposed class following the FCC's decision." *Id.* The same calculus applies here. Plaintiff alleges she received a text message; there is no evidence the practice has continued. A modest delay to allow the FCC to provide clarity on this dispositive issue stands only to push out the time when plaintiff may potentially recover monetarily. On the other side of the ledger, the Defendants are facing substantial liability based on the TCPA's onerous $500 or $1,500-per-text statutory damages

clause. *See* 47 U.S.C. § 227(b)(3). This substantial and strict liability, however, rests entirely Plaintiff establishing that the Defendants used an autodialer. On balance, the relative prejudices the parties may suffer weigh strongly in favor of a stay.

Third, as to the potential length of the stay, the *Scoma* court held that it was "not persuaded by plaintiffs' argument that a stay of this matter would likely last several years due to the judicial appeals from any final ruling," reasoning "that a stay will simplify and streamline the issues raised in this case and reduce the burden of litigation on the parties and on the Court." *Id.*

The public comment period has long since ended. An FCC ruling during the pendency of this lawsuit is highly likely.  Given that the composition of the FCC has changed since the 2015 Order, it is exceedingly likely that the FCC will narrow  and clarify the definition of an autodialer. Chairman  Pai and Commissioner O'Reilly dissented vehemently to the 2015 Order that was overturned in *ACA International*, and the D.C. Circuit favorably cited their dissents in its decision. *ACA Int'l*, 885 F.3d at 697, 702, 704. Those dissenting statements (and other official statements issued by Chairman Pai and Commissioner O'Reilly) evidence an approach to the TCPA that is disapproving of broad interpretations. *See, e.g.*, 2015 Order, at 8074 (Comm'r Pai dissenting) (noting that the 2015 Order "dramatically expands the TCPA's reach," is "flatly inconsistent with the TCPA"); *see also, id.* at 8087 (Comm'r O'Reilly dissenting) (calling the 2015 Order "unfathomable" in how it "further expands the scope of the TCPA"). Chairman Pai and Commissioner O'Reilly also issued statements following *ACA International* expressing their approval of the relevant portions of that decision. Commissioner Carr, who became a Commissioner in August of  2017 and was formerly a legal advisor to

19

Chairman Pai, also issued a statement approving of the decision in *ACA International,* stating that "the prior FCC exceeded the scope of the TCPA and reached a decision of eye-popping sweep." (A majority of the current Commission has publicly stated its disapproval of the FCC's broad interpretation of the Act.).  Given the views of the  current leadership of the FCC, and the Commission's rapid action in setting a notice and comment period so soon after *ACA International,* the Commission will almost surely act quickly to clarify the definition of an autodialer and narrow the definition to more closely align with the statute's plain language.

Not only is the FCC's ruling likely to come soon, as Judge Steele reasoned in *Scoma*, it "will simplify and streamline the issues raised in this case and reduce the burden of  litigation on the parties and on the Court." 2018 WL 2455301, at  *4. If this case is to proceed, the Court and the parties must grapple with the current, unclear, ATDS definition-an exercise that will surely require significant resources. These significant resources will be totally wasted as soon as the FCC issues its ruling and clarifies the ATDS definition. Accordingly, a modest delay is in the interest of both parties and the Court.

### Conclusion

For  the  reasons  stated  above,  Defendants  request  an  order  staying  and administratively closing this case.

Respectfully submitted,

/s/ Matthew Sarelson
Matthew S. Sarelson, Esq.
Florida Bar No. 888281
600 Brickell Avenue, Suite 1715
Miami, Florida 33131
Telephone: (305) 330-6090
Email: msarelson@kymplaw.com

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1.A.3, the undersigned certifies that he conferred with counsel for Plaintiff regarding the foregoing and counsel for Plaintiff does not agree to the relief sought herein.

<u>/s/ Matthew Sarelson</u>
Matthew Sarelson